**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

AUSTYN MATTSON, SETH
MUSSELMAN, JASON RANDO, &
DANIEL RIVERA,

          *Plaintiffs,*

vs.

WTS INTERNATIONAL, INC.

          *Defendant*

CASE NO:

<u>**COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND**</u>

1.      This is a case about a hospitality staffing company threatening laid off bartenders over *unsigned* non-compete agreements.

2.      In America, non-compete abuse is rampant. The problem is particularly acute in the State of Florida.

3.      Even in the midst of the Covid-19 pandemic and resulting economic crisis, companies continue to abuse non-compete agreements in an illegal effort to eliminate competition, restrict employee mobility, and ultimately suppress wages.

4.      Particularly given the current economic crisis, the issue of anticompetitive conduct in the labor markets has become a priority for federal regulators.

5.      In its recently released guidance, the Department of Justice Antitrust Division has made clear that it is not only policing collusion among competitors, but also unilateral efforts to illegally restrain trade.

6.     The obvious implication of this recent announcement: The Antitrust Division is watching for non-compete abuse. That is because non-compete abuse has profoundly negative impacts on America's labor markets.

7.     Over the past fifty years, non-compete agreements have gone from being exceptions to being the rule.

8.     Now companies and their corporate counsel operate as if non-compete agreements are business as usual and enforceable as a matter of ordinary course, even for waiters and bartenders.

9.     WTS is essentially a hospitality staffing and management company. WTS laid off several bartenders at a bar in Wesley Chapel, Florida.

10.     After WTS stopped operating the relevant location, it used non-compete agreements that these bartenders *never signed* to block them from obtaining employment with another company and getting back to work.

11.     This is an action for a declaratory judgment holding that Plaintiffs are not subject to any enforceable non-compete agreements, and for damages flowing from WTS's tortious interference and defamation.

## PARTIES

12.     Plaintiff Mattson is a citizen of Florida and a former WTS employee.

13.     Plaintiff Musselman is a citizen of Florida and a former WTS employee.

14.     Plaintiff Rando is a citizen of Florida and a former WTS employee.

15.     Plaintiff Rivera is a citizen of Florida and a former WTS employee.

16.     Defendant WTS is a corporation organized under the laws of Washington, D.C. with its principal place of business located in Rockville, Maryland.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and more than $75,000 at issue inclusive of damages sought and attorneys' fees but exclusive of interest and costs.

18.     This Court has personal jurisdiction over Defendant because it continuously conducts business in Hillsborough County, Florida.

19.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because the Defendants are subject to personal jurisdiction in this District and because the conduct at issue occurred within this District.

## GENERAL ALLEGATIONS

20.     The Lagoon at Epperson ("Epperson") is a master planned community by Metro Development Group, d/b/a Metro Places located in Wesley Chapel, Florida, within the greater Tampa Bay area.

21.     Epperson contains a number of amenities for its residents, including two bars: The Sandbar and the Cabana Bar.

22.     WTS managed these establishments. In effect, WTS operated as a professional employer organization or PEO. It screened applicants, hired staff, managed human resources, etc.

23.     In approximately March of 2020, the relationship between Metro Places and WTS came to a breaking point. Unhappy with WTS's performance, Metro Places gave notice of its intent to terminate their business arrangement.

24.     At this same time, as a result of the Covid-19 pandemic, WTS laid off its bar staff at the Epperson location.

25.     On March 18, 2020, WTS contacted all staff members (including Plaintiffs) at the Epperson location and advised them not to report to work until further notice. That correspondence advised that staff could seek unemployment. That correspondence further stated: "You are contractually prohibited from working on site. Do not report to work until further notice." From that date onward, Plaintiffs ceased to work for WTS.

26.     On April 6, 2020, WTS's Corporate Operations Director Amy Gallogly emailed staff members at the Epperson location to provide an update. Among other things, that email:

- Directed the Plaintiffs to explore applying for unemployment.

- Represented to Plaintiffs: "You remain an employee of WTS International on layoff status, and the lagoon remains closed. WTS is presently working with lagoon ownership to clarify its future at the lagoon, and during this time your signed non-competition covenant remains in full force and effect. We advise you to reject any advances from lagoon ownership regarding potential violations of this legally binding covenant."

27.     This correspondence was problematic for numerous reasons.

28.     First, the notion of remaining an employee "on layoff status" is absurd. Plaintiffs were laid off and directed to explore applying for unemployment.

29.     Second, WTS's representations regarding the Proposed Non-Compete Agreements are blatantly and demonstrably false. Plaintiffs never signed and accepted the Proposed Non-Compete Agreements.

### a. The Proposed Non-Compete Agreements

30.     When Plaintiffs began working for WTS, they electronically signed an offer letter ("Offer Letter"). The Plaintiffs' Offer Letters and Proposed Non-Compete Agreements are attached as Composite Exhibit A.

31.     The Offer Letter sets forth the position, the start date for employment, the wage, the requirement that new employees complete certain immigration paperwork, and the at-will nature of the employment.

32.     The Offer Letter is a one-page document with a signature block at the bottom, representing that the employee has "acknowledged and accepted" the foregoing terms. Each of the Plaintiffs electronically signed their respective Offer Letter.

33.     There is a separate one-page agreement, which is best described as the Proposed Non-Compete Agreement. *See* Proposed Non-Compete Agreements (p.2 of Exhibit A).

34.     Like the Offer Letter, the Proposed Non-Compete Agreement contains a signature block at the bottom for the employee to acknowledge and accept the non-compete agreement and related terms contained therein.

35.     Plaintiffs never signed, acknowledged, and accepted those restrictions. This is not an isolated instance or mere oversight. None of the Plaintiffs ever signed or accepted the restrictive covenants or any of the terms contained in the Proposed Non-Compete Agreement.

36.     Consider the following: Rivera electronically signed his Offer Letter on June 11, 2019 at 11:03am. That date and time stamp appears at the bottom of his Offer Letter. Rivera never signed the Proposed Non-Compete Agreement. There is no electronic signature and no corresponding date and time stamp.

37.     The same holds for all of the other Plaintiffs: There is an electronic signature, date, and time stamp on the Offer Letter, but nothing at the bottom of the respective Proposed Non-Compete Agreement.

**b. WTS's Efforts to Monetize the Unsigned Non-Compete Agreements**

38.     After Metro Places terminated its relationship with WTS and WTS laid off its staff, Metro Places engaged a new company to plan for reopening and to operate the bars and restaurants at that location.

39.     Specifically, Metro Places engaged a division of Oasis Outsourcing, Inc. called A1HR. Oasis/A1HR provide PEO services. Oasis/A1HR set out to hire staff for the bars in Epperson and plan for reopening.

40.     Plaintiffs are very familiar with the Epperson community. Certain of the Plaintiffs live in Epperson. Others have friends and family members who live there.

41.     When Plaintiffs learned that the bars were under new management and would be hiring, they inquired about employment.

42.     WTS learned of Plaintiffs' employment inquiries with the new PEO entity and immediately sought to monetize the situation.

43.     WTS represented to both Metro Places and Oasis/A1HR that Plaintiffs are all subject to non-compete agreements. This is false. Plaintiffs never signed any such agreements.

44.     WTS further demanded that either Metro Places or any new company managing the Epperson location pay it a fee of several thousand dollars per bartender to "buy out" the Plaintiffs' Proposed Non-Compete Agreements.

45.     Metro and/or Oasis/A1HR were willing to pay some consideration to WTS to resolve the dispute, avoid litigation, and help the Plaintiffs get back to work. But WTS rejected their offers as insufficient and demanded a higher ransom.

### c. The Proposed Non-Compete Agreements are Unenforceable and Illegal

46.     Because the Proposed Non-Compete Agreements were never signed and accepted, they are unenforceable.

47.     Even had Plaintiffs signed the Proposed Non-Compete Agreements, those Agreements would be unenforceable and illegal due to lack of any legitimate business interest.

48.     By their terms, the Proposed Non-Compete Agreements:

   a. Restrict Plaintiffs from working for any bar/establishment located within the Epperson community.

   b. Restrict Plaintiffs from working for any bar/restaurant affiliated with Metro Places.

   c. Restrict Plaintiffs from providing any services to "customers" Plaintiffs served while working in the Epperson community.

### i.     No Confidential Information

49.     There is no confidential information at issue of the type that constitutes a legitimate business interest.

50.     When pressed to establish a legitimate business interest in confidential information, WTS's General Counsel John Casterline made the following outlandish representations: *WTS is a management consulting company whose primary service offering is the provision of highly trained staff who **execute upon WTS's valuable confidential business protocols in support of our clients' business endeavors.** Our staff has value because it has been*

*imbued with WTS's sensitive "know-how"* in the amenity management space and in each staff member's specific department or function.

51.     This type of corporate gobbledygook is all too common in non-compete and trade secret cases.

52.     Generic references to confidential information, business protocols, and sensitive "know-how" do not constitute a legitimate business interest.

53.     To state the obvious: The Plaintiffs are bartenders. They work in the front of the house. Plaintiffs were never privy to any confidential information whatsoever, let alone confidential information that rises to the level of a legitimate business interest.  The notion that these bartenders have been "imbued" with WTS's corporate secrets is absurd.

### ii.     *No Protectable Relationships*

54.     There are no substantial, protectable customer or other relationships at issue. In focusing on customer relationships, the only plausibly legitimate use of restrictive covenants – as always - is to prevent unfair competition.

55.     In the customer context, the theory of unfair competition is that it would be unfair to allow an employee to leave a company and then take certain special customers or business with him.

56.     The facts and market realities render that sort of theory wholly inapplicable to this situation.

57.     The Plaintiffs worked for WTS at the Sandbar and the Cabana Bar within the Epperson community.

58.     Metro Places terminated WTS.

59.     The residents of the Epperson community will continue to frequent the bars in question because they located within their community. Those bars are community amenities.

60.     A new company will step in to staff and operate these establishments. Patrons from the Epperson community will continue to frequent these establishments.

61.     WTS does not have and never had any relationships with residents in the community, let alone protectable relationships.

62.     Protectable relationships only exist where the relationship is exclusive or near exclusive, long-term, customers cannot be easily identified and solicited by other merchants, and there is a reasonable expectation of continued future business.

63.     WTS never had exclusive or near exclusive relationships with bar patrons that live in the Epperson community.

64.     WTS has no expectation of any continued business at the Epperson location because it has been fired.

65.     Further, a company has no legitimate business interest in protecting relationships with former (as opposed to current) customers. Once again, WTS has no current customers at the Epperson location because it has been fired.

66.     WTS's relationship with its former employees (i.e. Plaintiffs) is not protectable.

67.     WTS's relationship with a former business counter-party (i.e. Metro Places) is not protectable.

68.     Literally anyone can go to the Epperson community, walk into a bar there, and apply for a job.

69.     Literally anyone can call the bars in the Epperson community and ask if they are hiring.

70.     There is no argument grounded in goodwill or relationships to justify enforcement of any restrictive covenants at issue.

### *iii.*     *No Extraordinary Training*

71.     WTS never provided Plaintiffs with any training beyond that which is standard in the industry.

### d. WTS Has No Legitimate Business Interest

72.     WTS's actions never were motivated by a desire to protect legitimate business interests.

73.     Instead, WTS had a singular goal: To leverage the Proposed Non-Compete Agreements and force any new staffing, management, or PEO company to pay it a substantial buyout fee.

74.     To put the matter in modern day terms: WTS was salty about Metro terminating its business arrangement. And in retaliation for that termination, WTS effectively has held several bartenders hostage and kept them out of work.

75.     WTS has no right to restrict Plaintiffs' employment mobility solely for the sake of suppressing competition and making money.

76.     WTS has no right to limit Plaintiffs' employment options simply because they once worked for WTS.

77.     WTS does not own the Plaintiffs or their labor, nor are the Plaintiffs WTS's indentured servants.

### COUNT I
### Tortious Interference

78.     Plaintiffs repeat and reallege the foregoing paragraphs 1 through 77 as if fully set forth herein.

79.     Plaintiffs had an opportunity for new employment with Oasis/A1HR at the bars in Epperson.

80.     WTS became aware of this opportunity and immediately acted to prevent Plaintiffs from pursuing that opportunity.

81.     Specifically, WTS contacted Metro Places and Oasis/A1HR and represented that Oasis/A1HR could not hire Plaintiffs because Plaintiffs all had signed non-compete agreements with WTS and were subject to valid, enforceable restrictive covenants.

82.     WTS further threatened Metro Places and Oasis/A1HR with litigation over the Proposed Non-Compete Agreements unless WTS was paid an exorbitant "buy out" price of several thousand dollars per employee.

83.     WTS's conduct is tortious because it is predicated on a fraudulent representation: That Plaintiffs had signed non-compete agreements when – in fact – they had not.

84.     WTS's conduct is tortious because it used improper means in an effort to extract a "buy out" price for unsigned non-compete agreements, which price it had no legal right to obtain.

85.     WTS's conduct is tortious because even if signed, the restrictive covenants at issue would constitute illegal restraints of trade.

86.     WTS's conduct is tortious because such conduct constitutes a unilateral attempt at obtaining participation in a conspiracy in restraint of trade, which has been held to violate Section 5 of the FTC Act. *See*, 15 U.S.C. sec. 45.

87.     WTS's conduct is tortious because it engaged in a fraudulent scheme utilizing interstate wire communications.

88.     WTS's actions toward the Plaintiffs and their prospective business relationship were intentional, unjustifiable, and not privileged.

89.     As a result of WTS's tortious conduct, Plaintiffs have been damaged through loss of an employment opportunity, loss of wages, and the emotional toll of not being able to obtain employment during the midst of a pandemic and economic crisis.

**COUNT II**
**Defamation *Per Se***

90.     Plaintiffs repeat and reallege the foregoing paragraphs 1 through 77 as if fully set forth herein.

91.     Defendant represented to, at a minimum, Metro Places and Oasis/A1HR that Plaintiffs had signed non-compete agreements and were subject to legally enforceable restrictive covenants that operated to prevent them obtaining employment anywhere in Epperson.

92.     Defendant's assertions that Plaintiffs signed any such agreements are blatantly and demonstrably false.

93.     Defendant's assertions naturally imply that Plaintiffs are the type of people who violate signed, enforceable contractual obligations.

94.     Such assertions implicate and disparage Plaintiffs' business reputations.

95.     Defendant's libelous writings and slanderous statements are defamation *per se* because, when considered alone, they tend to subject Plaintiff to distrust, ridicule, contempt, and disgrace, and are injurious to Plaintiffs' trade and professional reputations.

96.     Defendant knew or should have known that the statements about Plaintiffs would cause severe damage to Plaintiffs' reputations, business opportunities, social relationships, and career.

97.     The false and defamatory statements were made by Defendant with actual malice because they either knew of their falsity or made the statements with reckless disregard of their truth or falsity.

98.     In making the defamatory statements, Defendant acted intentionally, maliciously, willfully, and with the intent to injure Plaintiffs and enrich itself at Plaintiffs' expense.

99.     Plaintiffs have been harmed by the loss of the economic value in goodwill and reputation that they have built throughout their careers, and particularly during their time working in the Epperson community.

## COUNT III
### Declaratory Judgment

100.     Plaintiffs repeat and reallege the foregoing paragraphs 1 through 77 as if fully set forth herein.

101.     Defendant maintains that Plaintiffs signed non-compete agreements with the Defendant and are subject to valid, legally binding restrictive covenants.

102.     Defendant has represented its position to Plaintiffs, to their prospective new employer, and to related third parties.

103.     As a result of these representations, Defendant has successfully blocked the Plaintiffs from obtaining gainful employment in the midst of a pandemic and economic crisis.

104.     A dispute exists between Plaintiffs and the Defendant regarding both the existence of certain restrictive covenants and the enforceability of those restrictive covenants.

105.     There exists a bona fide controversy that flows from Defendant's assertion that Plaintiffs are bound non-compete agreements.

106.     Both Plaintiffs' and Defendant's legal rights and duties depend upon a declaration by this Court.

107.    The parties with an interest in the declaration sought are before this Court and will have an opportunity to respond.

108.    The controversy involves the legal relationship of the parties, having adverse interests with respect to which the declaration is sought.

109.    Neither the controversy nor the facts upon which it is based are hypothetical; the parties have a concrete controversy that is susceptible to conclusive judicial determination given that a declaration regarding the non-compete agreement's existence and/or enforceability would immediately clarify the parties' respective rights, powers, and duties.

110.    Plaintiffs seeks a declaration that they are not subject to any restrictive covenants with Defendant, or, that any such restrictive covenants are unenforceable and illegal.

## **PRAYER FOR RELIEF**

Plaintiffs request the Court enter judgment in their favor as follows:

a.  Declaratory judgment that they are not subject to any restrictive covenants with Defendant, or, that any restrictive covenants at issue are unenforceable;

b.  Compensatory damages flowing from Defendant's defamation to the fullest extent permitted by law;

c.  Presumed damages flowing from Defendant's defamation to the fullest extent permitted by law;

d.  Punitive damages to punish Defendant's defamation to the fullest extent permitted by law;

e.  Compensatory damages flowing from Defendant's tortious interference to the fullest extent permitted by law;

f.   Special damages, including damages for emotional distress, flowing from

Defendant's tortious interference to the fullest extent permitted by law;

g.   Punitive damages flowing from WTS's tortious interference to the fullest extent

permitted by law;

h.   An award of costs and reasonable attorneys' fees;

i.   Pre-judgment and post judgment interest;

j.   Final judgment on all counts in an amount of no less than $1,000,000.

k.   Such other relief this Court deems just and proper.

### <u>JURY TRIAL DEMAND</u>

Plaintiffs demand a jury trial on all issues that are triable to a jury.

Dated: May 29, 2020                                   Respectfully submitted,

By: <u>s/ *Jonathan Pollard*</u>

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com
**TRIAL COUNSEL**

Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

Pollard PLLC
100 SE 3rd Ave., Ste. 601
Fort Lauderdale, FL 33394
Telephone: (954) 332-2380
*Attorneys for Plaintiffs*